# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

---

**No. ACM 40370**

---

**UNITED STATES**
*Appellee*

**v.**

**Tyrion N. DAVIS**
Senior Airman (E-4), U.S. Air Force, *Appellant*

---

Appeal from the United States Air Force Trial Judiciary

Decided 26 January 2024[1]

---

*Military Judge*: Sterling C. Pendleton.

*Sentence*: Sentence adjudged 23 June 2022 by GCM convened at Royal Air Force Lakenheath, United Kingdom. Sentence entered by military judge on 21 July 2022: Dishonorable discharge, confinement for 10 months, and reduction to E-1.

*For Appellant*: Major Megan R. Crouch, USAF (argued); Major Matthew L. Blyth, USAF; Major Kasey W. Hawkins, USAF; Major Abhishek S. Kambli, USAF.

*For Appellee*: Captain Kate E. Lee, USAF (argued); Captain Olivia B. Hoff, USAF; Captain Jocelyn Q. Wright, USAF; Mary Ellen Payne, Esquire.

*Amicus Curiae for Appellant*: Chase W. Florance (law student, argued); Douglas WM. Godfrey, Esquire (supervising attorney)—Chicago-Kent College of Law, Illinois Institute of Technology, Chicago, Illinois.

*Amicus Curiae for Appellee*: Solaris A. Naquin (law student, argued); Adam J.C. Weber, Esquire (supervising attorney); Shmuel M. Wyckoff

---

[1] The court heard oral argument in this case on 15 November 2023 at the Chicago-Kent College of Law, Illinois Institute of Technology in Chicago, Illinois, as part of this court's Project Outreach Program.

(law student)—Chicago-Kent College of Law, Illinois Institute of Technology, Chicago, Illinois.[2]

Before RICHARDSON, DOUGLAS, and WARREN, *Appellate Military Judges*.

Senior Judge RICHARDSON delivered the opinion of the court, in which Judge DOUGLAS and Judge WARREN joined.

_____

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

_____

RICHARDSON, Senior Judge:

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification of sexual assault against CJD in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[3,4] The court members sentenced Appellant to a dishonorable discharge, confinement for ten months, and reduction to the grade of E-1. The convening authority took no action on the findings or sentence.

Appellant raises seven issues on appeal, which we have reworded: (1) whether Appellant's conviction is legally and factually sufficient; (2) whether the military judge abused his discretion in admitting handwritten notebook pages ("journal") from CJD as prior consistent statements; (3) whether the military judge erred in granting a government challenge for cause based on the member's bias against the Government and a trial counsel; (4) whether the military judge erred in denying a defense challenge for cause against a member; (5) whether Appellant was deprived of a constitutional right to a unanimous verdict; (6) whether the military judge erred in finding a good faith basis for the Government to inquire into specific instances of Appellant's conduct

_____

[2] Both supervising attorneys for *amicus curiae* students representing Appellant and Appellee were properly admitted *pro hac vice* to practice before this court.

[3] Unless otherwise noted, all references in this opinion to the UCMJ, Military Rules of Evidence, and Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2019 ed.).

[4] Appellant was acquitted of four other Article 120, UCMJ, specifications against CJD and all six Article 120, UCMJ, specifications against LCC; two specifications alleged in violation of Article 128, UCMJ, 10 U.S.C. § 928—one each against CJD and LCC; and one specification of wrongful use of marijuana, alleged in violation of Article 112a, UCMJ, 10 U.S.C. § 912a.

with anticipated defense witnesses in sentencing; and (7) whether trial counsel's sentencing argument was improper. We ordered oral argument focusing on issues (2) and (6), to include whether issue (6) is preserved when Appellant did not call the anticipated witnesses.[5]

We have carefully considered issue (5) and find it does not require discussion or warrant relief. *See United States v. Guinn*, 81 M.J. 195, 204 (C.A.A.F. 2021) (citing *United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987)). We find no error materially prejudicial to Appellant's substantial rights, and we affirm the findings and sentence.

## I. BACKGROUND

CJD alleged Appellant committed several crimes upon her in 2018 and 2019, the first happening before they started dating, and the last being the sexual assault during their marriage of which Appellant was convicted. LCC alleged Appellant committed various sexual crimes against her over the course of two days in June 2020.

CJD and LCC were friends from school, including college, in England. Appellant and JV, both male Airmen, were friends. LCC and JV started dating around October 2017. In early 2018, through LCC, CJD met Appellant while celebrating her 18th birthday; Appellant was 19 years old. A couple months later they began dating, and by the end of the year they were married. CJD and Appellant moved in together, but when CJD had classes she stayed near her university, a three-plus-hour train ride away. LCC and JV broke up around April 2019. To varying degrees, CJD remained friends with them both.

In late June 2019, CJD accompanied Appellant on a trip to California to visit his relatives. The same day as her return to England, in July 2019 CJD went on a four-day trip to Ibiza with JV. CJD testified that JV and Appellant were not close, but JV was her "best friend at the time."

---

[5] Specifically, we ordered oral argument on the following issues:

> I. Whether the military judge abused his discretion in admitting the alleged victim's notebook entries as prior consistent statements pursuant to Mil. R. Evid. 801(d)(1)(B)(i), finding multiple motives to fabricate.

> II. Whether the military judge erred in finding that government trial counsel had a good faith basis to inquire into specific instances of Appellant's conduct with anticipated defense witnesses in sentencing.

> III. Whether issue II is preserved when Appellant did not call the anticipated witnesses in sentencing.

CJD testified as to Appellant's sexual assault of her that occurred shortly after her return from Ibiza:

> One night [Appellant] wanted to have sex and I didn't. We were in bed and I told him that I didn't want to have sex. When he tried to touch me, I pushed his hand away and I told him no several times. I rolled on to my side. He then cuddled me and then, several minutes later, he then -- he pushed me on to my back. I asked him what he was doing. He got on top of me. I told him to stop and I tried to push him away. Then he inserted his penis into my vagina and continued to have sex with me.

CJD further explained that the next day, CJD and Appellant had consensual sex. Trial counsel continued his query:

> Q. What happened -- what happened after -- you talked about the non-consensual sex; the next day, consensual sex. Now you are not living together today. What happened?
>
> A. We had a conversation about the non-consensual sex and I told him how that made me feel. He got pretty emotional about it and told me that I didn't say no in a tone of voice that made him think that I wanted to stop. And that I didn't do enough to make him think that I didn't want to. And we had a pretty long conversation about it. And then I think, less than a week after that, I went to my parents.
>
> Q. So after you went to your parents, did you ever move back in with him?
>
> A. No. I went back. We had a conversation about me collecting my stuff and us splitting and getting a divorce.

CJD continued a relationship with JV, which only at trial did she admit was sexual.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant challenges the legal and factual sufficiency of his conviction on two grounds: (1) CJD lacks credibility, and did consent to the sexual act; or (2) Appellant had a reasonable mistake of fact as to consent. We find the evidence presented at Appellant's trial sufficient to support the conviction.

### 1. Additional Background

Appellant and CJD communicated regularly over Facebook.[6] The topic of the sexual assault came up in several of these communications.

In a conversation on 10 August 2019, Appellant and CJD discussed their marriage following the trip to Ibiza and the sexual assault. Appellant presumed CJD left him for JV. She replied, "It has nothing to do with why we ended," and also said, "I couldn't get over what happened." CJD said, "It's not like I didnt say stop ty" and "I said stop more than once." Appellant replied:

> I never said you didn't say stop
>
> I said you didn't say it like you meant it
>
> Every other time if I didn't grasp it you would push me look at me and say stop and I would get the message
>
> Every other time

CJD replied, "I pushed your hand away and said stop," "I also asked what you were doing," and "you said it's just a tease for the morning." Appellant responded:

> That you didn't do what you normally do. Which is SERIOUSLY say it
>
> You say stop alot
>
> And I'm not blaming you for what I did

Later, CJD said, "We had sex after I told you to stop more than once" and "I dont know how you expect me to get over that;" Appellant suggested they go to counseling. CJD repeated this sentiment: "I'm not leaving you for him, I'm leaving because of what happened." Appellant repeated this sentiment: "Your tone didn't say stop."

In a lengthy message to Appellant, CJD explains the impact of his sexual assault on her:

> [B]ut what you did that night f[**]ked me up, like really f[**]king bad. I am still getting nightmares from it. . . . Me saying no, actually meant no. I know that you didn't think I wanted to stop even though I said it four times and pushed you away because I didn't say it in a tone of voice that made you think I wanted to stop. But those other times, when I said stop and

---

[6] Throughout this opinion and unless otherwise noted, content from these messages appears without correction.

> changed my mind, I felt bad that I didn't want to and felt that I had to because that was what you wanted.
>
> . . . .
>
> You have told me throughout this whole thing that I haven't taken your feelings into consideration when making decisions, but you didn't take my feelings into consideration that night. You just did what you wanted to do, even though I had already said stop, [four] times.

Appellant's reply included this:

> Me misreading you during sex didnt make sense to me, which it now does, bit that too was killing me. I cant put a puzzle together with missing pieces, and that lack of knowledge doesn't help with my anxiety.

CJD testified she made it clear to Appellant she did not want to have sex with him that night when she "told him no," "told him to stop several times," "tried to push him away," and "rolled over." She also differentiated this night from other nights in that this time she "just laid still on [her] back," but during the consensual encounters she would participate, for example by touching him with her arms and moving her body.

### 2. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). "Our assessment of legal and factual sufficiency is limited to the evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citation omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). "[T]he term 'reasonable doubt' does not mean that the evidence must be free from any conflict . . . ." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citation omitted). In resolving questions of legal sufficiency, we are "bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Bright*, 66 M.J. 359, 365 (C.A.A.F. 2008) (internal quotation marks and citations omitted). The evidence supporting a conviction can be direct or circumstantial. *See United States v. Long*, 81 M.J. 362, 368 (C.A.A.F. 2021) (citing Rule for Courts-Martial (R.C.M.) 918(c) (additional citation omitted)). "[A] rational factfinder[ ] could use his 'experience with people and events in weighing the probabilities' to infer beyond a reasonable

doubt" that an element was proven. *Id.* at 369 (quoting *Holland v. United States*, 348 U.S. 121, 140 (1954)). The "standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (internal quotation marks and citation omitted).

"The test for factual sufficiency is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *Rodela*, 82 M.J. at 525 (second alteration in original) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

To convict Appellant of sexual assault, the Government was required to prove the following elements beyond a reasonable doubt: (1) Appellant committed a sexual act upon CJD by penetrating her vulva with his penis, and (2) Appellant did so without CJD's consent. *See* 10 U.S.C. § 920(b)(2)(A); *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 60.b.(2)(d). "The term 'consent' means a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance does not constitute consent." *MCM*, pt. IV, ¶ 60.a.(g)(7)(A). "All the surrounding circumstances are to be considered in determining whether a person gave consent." *MCM*, pt. IV, ¶ 60.a.(g)(7)(C).

"[I]t is a defense to an offense that the accused held, as a result of ignorance or mistake, an incorrect belief of the true circumstances such that, if the circumstances were as the accused believed them, the accused would not be guilty of the offense." R.C.M. 916(j)(1). "If the mistake goes to an element requiring general intent, it 'must have existed in the mind of the accused and must have been reasonable under all the circumstances.'" *Rodela*, 82 M.J. at 526 (quoting R.C.M. 916(j)(1)). An honest and reasonable mistake that the victim consented to the charged sexual act is an affirmative defense to sexual assault. *See United States v. McDonald*, 78 M.J. 376, 379 (C.A.A.F. 2019). "If a mistake is honest yet 'patently unreasonable,' the defense is unavailable to an appellant." *Rodela*, 82 M.J. at 526 (citing *United States v. Davis*, 76 M.J. 224, 230 (C.A.A.F. 2017)). "Once raised, the Government bears the burden to prove beyond a reasonable doubt that the defense does not exist." *Id.* (citing R.C.M. 916(b)(1)) (additional citation omitted). "Just as a victim's 'lack of verbal or physical resistance does not constitute consent,' a victim's lack of verbal or physical

resistance, without more, is not some evidence of a reasonable belief that consent has been obtained (or given)." *Id.* at 529 (quoting *MCM*, pt. IV, ¶ 60.a.(g)(7)(A)); *see also McDonald*, 78 M.J. at 377 (explaining for a reasonable belief, "[t]he burden is on the actor to obtain consent, rather than the victim to manifest a lack of consent").

### 3. Analysis

Appellant asserts the conviction is legally and factually insufficient because the "evidence adduced at trial demonstrates that CJD fabricated the non-consensual nature of the sexual encounter such that this [c]ourt cannot be convinced of [Appellant's] guilt beyond a reasonable doubt" and "[e]ven if CJD did not fabricate her lack of consent, no reasonable fact finder could have found beyond a reasonable doubt that [Appellant] did not mistakenly believe that CJD consented." We find the evidence presented at Appellant's trial sufficiently supports the findings of guilty, and does not support the defense of mistake of fact as to consent.

The strongest evidence supporting the conviction for sexual assault is found in the messages between Appellant and CJD. In those messages, CJD credibly accuses Appellant of wrongfully having sex with her despite her saying "no" four times. In those messages, Appellant does not deny the act occurred, or that CJD repeatedly said "no," but claims he "misread" CJD. In essence, Appellant claimed he did not know that "no" meant "no."

Assuming Appellant honestly believed CJD did not mean "no," and instead was consenting to the sexual act, the defense of mistake of fact fails if such belief was unreasonable. The court members could have been convinced that, under the totality of the circumstances, Appellant's belief that CJD consented to sex that night was unreasonable. CJD testified about how this time was different, including telling Appellant no four times, physically pushing him away, rolling over, and then lying still why he continued to penetrate her vagina with his penis until he ejaculated.

In sum, a rational finder of fact could have found the Government proved each element of the offense, and disproved the defense of mistake of fact as to consent, beyond a reasonable doubt. Additionally, we are convinced of Appellant's guilt beyond a reasonable doubt.

## B. Prior Consistent Statement

Appellant claims the military judge erred in allowing pages from CJD's journal to be admitted under Mil. R. Evid. 801(d) as CJD's prior consistent statements.

### 1. Additional Background

In one of her messages to Appellant, CJD accused Appellant of lying about the sexual assault:

> Finally, telling people that I was cheating on you with [JV] for four months when that wasn't true kinda hurt. So many people think that I am a terrible person now and believe that I lied about what happened that night. Either because that's what you have told them or because you have not told them the full story. It caused so many issues, especially with [LCC]. It wasn't fair for [JV] considering that he had nothing to do with the ending of our relationship and lost many friends because of things which you said. And the things that [LCC] is saying about me now also isn't fair. I had nothing to do with her a [JV] splitting up, but she is now saying that [JV] an I were sleeping together this whole time and that I was never a good friends and didn't have good intensions with her when that wasn't the case.

During direct examination, the Government asked CJD about her message to Appellant which stated: "If I went to the police would you still tell the truth?" Appellant replied: "Honestly if you went to the police I wouldn't judge you, you're entitled to feel and do whatever you want, but I'd tell the truth from my point of view."

> Q. From your question in August 2020, I take it, certainly, between when you left in July 2019 and August 2020, you had not already reported him to the police; is that right?
>
> A. That's correct.
>
> Q. Why had you not reported him to the police?
>
> A. I --
>
> Q. Did you think about it at all?
>
> A. I thought about it a lot. I was still -- it took me a long time to realize that it wasn't my fault that it happened. For a long time, I continued to think it was my fault and that I didn't do enough and it took me a long time to realize that. When I finally did, I considered going to the police and that's what that message was about.

The Defense questioned CJD during cross-examination about her reporting the alleged offenses. CJD testified she told JV first that Appellant had sexually assaulted her. She also told her mother "because she asked me why I had left [Appellant]." The cross-examination continued:

Q. Let's talk about when you actually reported these to law enforcement. It was several years later, wasn't it?

A. Yes.

Q. It wasn't until [LCC] contacts you, correct?

A. Yes.

. . . .

Q. . . . But what she does tell you is that [Appellant] locked her in the house, drugged her and raped her?

[Circuit trial counsel]: Objection; hearsay, Your Honor.

[Military Judge (MJ)]: Defense?

[Circuit defense counsel (CDC)]: It's offered for the effect on the listener. What she did after she learned of this assertion by [LCC].

MJ: Okay. Overruled.

Q. She informed you of that?

A. Yes.

Q. Once she informed you that, that prompted you to take some action?

A. Yes.

Q. The action you took was that you reached out to the Air Force Office of Special Investigations [(AFOSI)]?

A. Yes.

Q. With information that [LCC] gave you?

A. Yes.

Q. By that, I mean the contact information for an agent?

A. Yes.

Q. That was 21 September of 2020?

A. I can't remember exactly when it was, but it was in 2020, yeah.

Q. Approximately that time?

A. I think so.

Q. And it was there, for the first time, you disclosed to someone in authority what you have now testified to, right?

A. Yes.

In addition to probing CJD's reporting of the offenses, during cross-examination of CJD the Defense highlighted that she lied about having had a sexual relationship with JV. The Defense implied that CJD conspired with JV to "line up" her "story" about when the sex occurred, and even had a conversation just before trial about their testimony. Relating to this issue, the Defense expressly charged CJD with lying before trial:

Q. You lied to the Defense, correct?

A. Yes.

Q. And you lied to the prosecutors?

A. Yes.

Q. Until this morning, you made no effort to correct that lie, did you?

A. No.

Q. You didn't come to the Prosecution and fess up?

A. No.

Q. You didn't come to the Defense and say, by the way, here is the truth?

A. No.

. . . .

Q. After that information that [JV] was now under immunity, then you came in this morning for the first time and told the truth?

A. Yes.

Q. You changed your story?

A. Yes.

On redirect examination, the Government asked CJD why, as recently as the weekend before trial, she denied she had a sexual relationship with JV: "It wasn't something that I was proud of or something that I wanted to talk about. I also didn't want [JV] to get in any trouble. When I found out that he had immunity, I knew then that he wouldn't get in any trouble for it."

At the end of its redirect examination, the Government asked CJD about a journal (Prosecution Exhibit 13). CJD testified she wrote those 11 journal pages in a notebook sometime between about January and May 2020, before LCC told her Appellant sexually assaulted LCC—which assault allegedly

happened in June 2020. Pages one through three of the journal described Appellant's sexual assault of CJD; the other pages concerned CJD's other allegations of sexual misconduct. The Government offered the journal as a prior consistent statement of CJD; the Defense objected, and the military judge held a hearing outside the presence of the court members.

The Government explained it was offering the journal under Mil. R. Evid. 801(d)(1)(B)(i).[7] The Government explained:

> The Defense has created the impression, or at least implied, that she has fabricated or recently been motivated to make these allegations by learning this information from [LCC]. These journal entries predate that. That would fall under [Mil. R. Evid.] 801(d)(1)(B)(i) *to rebut an express or implied charge that the declarant recently fabricated or acted from a recent improper influence or motive in testifying*.
>
> . . . .
>
> They raised the implication that she came to believe that a second victim had been victimized and so she is now motivated to say that she was the victim as well.
>
> . . . .
>
> Even if it's only a motive to exaggerate what happened, that still raises the issue of her credibility on these points. Even if it's only a motive to misrepresent some kind of nuanced detail, they are still putting it at issue of her motivations and why she's making these allegations, why she ultimately went to law enforcement later and why she's in court today. These statements precede all of that, that motive being raised in her mind when she learns that there was a second victim, [LCC], a friend of hers.

---

[7] The Government also asserted a basis under Mil. R. Evid. 801(d)(1)(B)(ii): the Defense implied that CJD had an "ulterior motive" when she "reported a sexual assault to [JV], [whether] because she was trying to get attention or possibly she was trying to make up a reason to leave [Appellant] and then find a reason to get together with [JV]." The Government continued,

> These are journals she wrote to herself, which would rehabilitate her credibility in the sense that she's not writing these journals and giving them to [JV]. She's not writing these journals and engaging in these attention-seeking behaviors. *It rehabilitates her credibility on another ground that the Defense has challenged*.

(Emphasis added). Trial defense counsel objected, but did not argue to the military judge why the journal was not admissible under Mil. R. Evid. 801(d)(1)(B)(ii).

(Emphasis added).

The Defense explained its position regarding Mil. R. Evid. 801(d)(1)(B)(i):

> As to the first one, the motive to lie that must be predated is the decision or mental change to alter what were consensual activities, if they even happened, into sexual assault in order to rehabilitate her image in the eyes of [JV] . . . and anyone who might find out that she's left her husband for one of his best friends. That happened during the trip to Ibiza is when the first sexual acts happened, which was apparently sometime in mid-July of 2019. We believe that's where the motive to fabricate started and continued from there. Any statement offered under [Mil. R. Evid.] 801(d)(1)(B)(i) would have to have been made prior to that.

Additionally, trial defense counsel argued the journal should be inadmissible under Mil. R. Evid. 403, essentially because it lacked "reliability" which diminished its probative value. That argument centered around the foundation for the journal, as it was handwritten and undated, as well as CJD's motives for writing it. The Government countered, in part, that those concerns go to the "weight and not the admissibility of the evidence."

The military judge provided his ruling orally. He agreed with the Government that the journal entries "rebut [ ] the implication that [CJD] was either piling on, or some other ulterior motive, in relation to [LCC]'s allegations." The military judge also found "the probative value of this information is high [ ] for its stated purpose to rebut an allegation of recent fabrication." Regarding the weight of the evidence, he specifically told trial defense counsel that he would give them "an opportunity to cross-examine [CJD] on . . . when she wrote the journal, why it's undated, those sorts of things, and, of course, allow argument on the issue."

After the military judge's ruling, the Government continued its redirect examination of CJD. She testified about a FaceTime conversation LCC initiated with her in summer 2020.

> Q. Based on your relationship at the time, and [LCC] sharing that information, how did you respond after she told you about that?

> A. I apologized that it happened to her. I'm sorry, I said that I was sorry that it happened to her and for her to have to go through something like that. Then we spoke a little bit about [Appellant] and then I explained that there had been a couple of things in our relationship that weren't as they should have been.

Q. After that phone conversation when you learned about that, how did that make you feel?

A. I was a mess. I was very upset.

Q. Why?

A. I felt partially guilty for not already going to the police. I felt like I maybe could have prevented it somehow by going to the police sooner.

. . . .

A. I felt guilty that, because I hadn't gone to the police and told them what happened to me, he was able to do it to somebody else.

On re-cross-examination, the Defense implied that CJD relied on the journal to answer AFOSI's questions.

After CJD testified and before LCC testified, the military judge addressed his ruling on the journal entry:

Just briefly, I wanted to address the prior consistent statement ruling yesterday. We mentioned that there were multiple motives to fabricate or improper influences. One that we didn't talk about was, Defense, you sort of attacked the witness on -- the implication was collusion with [JV] talking this week. The journal entry would precede that improper influence. Nonetheless, I admitted it to -- as I stated yesterday, to rebut the express or implied charge that she had recently fabricated or acted from a recent improper influence, and that being [LCC's] allegations.

On direct examination, LCC testified about reporting Appellant's sexual assault of her to CJD:

Q. Ma'am, I want to kind of circle back to one of the people we talked about at the very beginning. We talked about your friendship with [CJD]. At this time, were you regularly speaking with her in June of 2020?

A. No.

Q. After this happened to you, did you contact her?

A. I did reach out. I wanted to make sure that she was safe and that she was staying at home and that's when I actually found out she was with my ex-partner [JV], which I was glad about because I knew he would keep her safe.

14

Q. Why did you reach out to [CJD] after you had experienced sexual assault from [Appellant]?

A. Because of the situation with the [hole[8] in the] wall, which [Appellant] showed me, and his behavior. I knew from, after that, if that's his normal behavior, I'm not the first.

Q. Did you tell her some of what you had experienced when you stayed at [Appellant]'s residence?

A. I didn't go into details, but I did say -- I managed -- it was a difficult situation. I managed to get out. I reported it and then I gave the card that I was given from Lakenheath[9] to her, just in case she needed to talk to anyone.

Before the court members deliberated on findings, the military judge provided them an untailored instruction on prior consistent statements:

Prior Consistent Statement. You may have heard evidence that witnesses made statements prior to trial that may be consistent with their testimony at this trial. If you believe that such consistent statements were made, you may consider them for their tendency to refute a charge of recent fabrication, improper influence or improper motives. You may also consider the prior consistent statement as evidence of the truth of the matters expressed therein.

**2. Law**

We review "a military judge's decision to admit evidence for an abuse of discretion." *United States v. Frost*, 79 M.J. 104, 109 (C.A.A.F. 2019) (citing *United States v. Humpherys*, 57 M.J. 83, 90 (C.A.A.F. 2002)). We find an abuse of discretion when the military judge's findings of fact are clearly erroneous, his decision is influenced by an erroneous view of the law, or his decision is outside the range of choices reasonably arising from the applicable facts and law. *United States v. Kelly*, 72 M.J. 237, 242 (C.A.A.F. 2013). "[U]nder the last of these tests," we must find "'more than a mere difference of opinion'; rather, the military judge's ruling 'must be arbitrary, fanciful, clearly unreasonable or clearly erroneous.'" *United States v. Uribe*, 80 M.J. 442, 451 (C.A.A.F. 2021)

---

[8] Earlier LCC had testified that the night Appellant sexually assaulted her: "[Appellant] showed me where, I believe it was a phone of somebody's, either his or his ex's, was thrown out of anger and there was a hole in his living room wall."

[9] The evidence suggests AFOSI agents gave LCC a business card with their contact information. CJD contacted those AFOSI agents, and they interviewed her in October 2020.

(Maggs, J., concurring in the judgment) (quoting *United States v. Collier*, 67 M.J. 347, 353 (C.A.A.F. 2009)). "[W]here the military judge places on the record his analysis and application of the law to the facts, deference is clearly warranted." *United States v. Flesher*, 73 M.J. 303, 312 (C.A.A.F. 2014) (quoting *United States v. Downing*, 56 M.J. 419, 422 (C.A.A.F. 2002) (additional citation omitted)).

"Hearsay is an out-of-court statement offered into evidence to prove the truth of the matter asserted." *United States v. Finch*, 79 M.J. 389, 394 (C.A.A.F. 2020) (citing Mil. R. Evid. 801(c)). "Hearsay generally is not admissible in courts-martial." *Id.* (citing Mil. R. Evid. 802).

A prior consistent statement is not hearsay and may be admitted as substantive evidence if three threshold requirements are met: (1) the declarant testifies at trial; (2) the declarant is subject to cross-examination about the statement; and (3) the statement is consistent with the declarant's testimony. *Id.* at 394–95 (citing Mil. R. Evid. 801(d)(1)(B)) (additional citation omitted). Regarding the third threshold requirement, Mil. R. Evid. 801(d)(1)(B) provides that the prior consistent statement must be offered "(i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or (ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground."

To be admissible under Mil. R. Evid. 801(d)(1)(B)(i), "the prior statement, admitted as substantive evidence, must precede any motive to fabricate or improper influence that it is offered to rebut . . . ." *Frost*, 79 M.J. at 110 (citations omitted).[10] Additionally, "where multiple motives to fabricate or multiple improper influences are asserted, the statement need not precede all such motives or inferences, but only the one it is offered to rebut." *Id.* (citations omitted). To meet the criteria for a prior consistent statement, a declarant's out-of-court statement "need not be identical in every detail to the declarant's . . . testimony at trial." *Finch*, 79 M.J. at 398 (omission in original) (quoting *United States v. Vest*, 842 F.2d 1319, 1329 (1st Cir. 1988)). Rather, it need only be "for the most part consistent . . . with respect to . . . fact[s] of central importance to the trial." *Id.*

If a military judge has erred in admitting evidence, the Government bears the burden of establishing that the erroneous admission was harmless. *Frost*, 79 M.J. at 111 (citation omitted). For preserved "nonconstitutional evidentiary errors, the test for prejudice 'is whether the error had a substantial influence

---

[10] The United States Court of Appeals for the Armed Forces in *Finch* held that its "long-standing line of precedents interpreting the old version of the rule, as recently discussed in *Frost*, 79 M.J. at 110, continue to apply with full force to the new version of [Mil. R. Evid.] 801(d)(1)(B)(i)." 79 M.J. at 395.

on the findings.'" *United States v. Kohlbek*, 78 M.J. 326, 334 (C.A.A.F. 2019) (quoting *United States v. Fetrow*, 76 M.J. 181, 187 (C.A.A.F. 2017)). In conducting this prejudice analysis, we weigh four factors: (1) the strength of the Government's case; (2) the strength of the Defense's case; (3) the materiality of the erroneously admitted evidence; and (4) the quality of the erroneously admitted evidence. *Id.* (citations omitted).

We may affirm a military judge's ruling when the military judge reaches "the correct result, albeit for the wrong reason." *United States v. Bess*, 80 M.J. 1, 12 (C.A.A.F. 2020) (quoting *United States v. Robinson*, 58 M.J. 429, 433 (C.A.A.F. 2003)), *cert. denied*, 141 S. Ct. 2792 (2021).

**3. Analysis**

Appellant asserts the "military judge erred in finding the journal entries . . . preceded CJD's motive to fabricate, and that error prejudiced [Appellant]." Additionally, Appellant asserts no separate motive to fabricate was raised that post-dated those journal entries:

> CJD had only one motive to fabricate—she wanted to appear as an abused wife instead of the adulteress she became when she began her relationship with [ ] JV. This motive to fabricate continued, unchanged, from July of 2019 until her testimony at trial.
>
> . . . .
>
> Her motivation did not change as she told different people the story. She wanted [ ] JV, her mother, LCC, and AFOSI to all believe that she was justified in leaving [Appellant] for [ ] JV. Telling the same lie based on the same motive to different people does not create a different or new motive to fabricate.

The Government asserts the Defense asserted or implied two motives to fabricate: "(1) CJD's motive to maintain her reputation, and (2) CJD's attempt to mend her friendship with LCC by piling on more allegations against Appellant." Regarding prejudice, the Government asserts: "The journal entries acted as corroboration for CJD's statements, but they were not the cornerstone of the [G]overnment's case. Appellant's admissions via the Facebook messages, in which he admitted he heard her say no to his sexual advances, were more persuasive than her journal entries."

The Government offered the journal entries, Prosecution Exhibit 13, as a non-hearsay, prior consistent statement to rebut an express or implied change that CJD recently fabricated her testimony or acted from a recent improper influence or motive in so testifying. The military judge agreed. He allowed the prior statement for the Government's "stated purpose to rebut an allegation of

recent fabrication," specifically to "rebut [ ] the implication that [CJD] was either piling on, or some other ulterior motive, in relation to [LCC]'s allegations."[11] We find the military judge did not abuse his discretion.

The Defense argued that before CJD reported to law enforcement, she lied about being sexually assaulted by Appellant to save face for having cheated on Appellant with JV, and to garner attention from JV. They also suggested she told this same lie to law enforcement. But in their cross-examination of CJD, the Defense implied CJD lied to law enforcement because of what LCC told her about Appellant. Appellant would have us find this was not a different motive to lie, only a different motive to report. We are more persuaded by the Government's argument on this point: "Trial defense counsel had no other purpose in highlighting that CJD only reported the allegations for the first time after LCC, if not to imply that there was some sort of improper influence. Trial defense counsel was trying to imply that LCC's statement caused CJD to report untruthful allegations."

The military judge's finding that the journal entry was a statement of CJD that preceded the express or implied charge that CJD lied to "pile on" or bolster LCC's allegations against Appellant was not an abuse of discretion.

Appellant also challenges the weight of the entries, describing them as "not journal entries that [CJD] recorded close in time to the alleged events, but her post-reflection narrative of different interactions that she wanted to portray as sexual assaults." Appellant asserts that, because of the lack of reliability, the exhibit "does not qualify as a prior consistent statement." We find the military judge did not err in finding the journal had probative value, that it was sufficiently authenticated, and allowing the trial defense counsel to challenge the weight of this evidence before the court members. *See* Mil. R. Evid. 901(a), (b)(1) (testimony of a witness with knowledge that an item is what it is claimed to be can be sufficient evidence for authentication).

Finally, Appellant claims prejudice not only because the members could consider the journal for the truth of the matters asserted therein, but "the military judge's admission of Pros[ecution] Ex[hibit] 13 indicated an endorsement of the exhibit to the members." We find no merit to this argument.

---

[11] After CJD testified, the military judge revisited his ruling on this issue and suggested he would allow the prior statement on another basis. He alluded to the Government's argument about "multiple motives to fabricate or improper influences," then said, "Defense, you sort of attacked [CJD] on -- the implication was collusion with [JV] talking this week. The journal entry would precede that improper influence." But he clarified that he "admitted it to . . . rebut the express or implied charge that [CJD] had recently fabricated or acted from a recent improper influence, and that being [LCC]'s allegations."

**C. Good Faith Basis**

**1. Additional Background**

After the Government admitted documents and rested its pre-sentencing case, the military judge took up an issue raised by the Defense. The military judge described the issue as follows:

> [I]f defense counsel decides to put on certain types of [ ] evidence with regard to character or similar to character, the trial counsel would attempt to test the basis of the witness's knowledge with a prior incident. The issue that defense counsel is citing is that trial counsel does not have a good faith basis to ask the questions based on the prior act.

The military judge stated he would not make any further rulings about any such questions at that time. The Defense stated they understood, echoing, "You will rule on whether it is a good faith basis or not, but that would be the end of the analysis."

The Defense submitted a two-page email, marked as Appellate Exhibit LXIV, as "the entirety of the factual evidence related to this issue that is in the possession of the Government." The Government asserted the factual basis in this email was a "victim in another case ma[king] a formal statement to law enforcement that she overheard a conversation from an eyewitness to [Appellant] molesting his niece" and "that is well beyond what is required for a good faith basis." The Government agreed this email alone supported their good faith factual belief.

The email was from an AFOSI agent who was investigating a relative ("subject") of Appellant—possibly Appellant's brother—to an AFOSI agent investigating Appellant. The email stated they interviewed a "victim" who related a phone call conversation she overheard between the subject and the subject's mother and a sister. The victim heard the sister say that she caught Appellant "touching their niece." The subject then confirmed that Appellant "molested" the niece before Appellant joined the Air Force, and the sister saw him do it. The email also stated the mother and sister relayed the same information to the subject's step-mother, who said Appellant "was relieved it was out in the open now and he was receiving counseling for it." Additionally, the email stated the niece's mother and another sister of subject each said the niece's allegations were false. Finally, the email details the AFOSI agent's unsuccessful attempts to speak to more witnesses to obtain further information.

The Defense highlighted two federal cases for the military judge's consideration as persuasive authority: *United States v. Abair*, 746 F.3d 260 (7th Cir. 2014), and *United States v. Sampol*, 636 F.2d 621 (D.C. Cir. 1980) (per curiam). The Defense stated the "good faith basis standard for cross-examination under

Federal Rule 608(b)(1) is not a high bar. A 'well-reasoned suspicion that a circumstance is true is sufficient.'" The Government countered that they "have a well-reasoned suspicion that [Appellant] did, in fact, molest his niece prior to [Appellant] joining the Air Force."

Even with some members of the family denying it happened, the Government explained:

> Having thought through this, with the information that we have, we do, in fact, have a reasonable suspicion that this did take place. If the Defense opens the door to "have you heard" or "did you know" type questions regarding this, it's a fair question to ask the witness to test their basis of knowledge and forming their opinion that they are offering to the members. If the Defense doesn't want to offer this evidence, that's their choice but, if they do go down this road, we have a reasonable suspicion, a good faith basis to ask the questions.

The military judge found the Government had a good faith basis to question witnesses about Appellant allegedly molesting his niece. He cited an additional case, *United States v. Benabe*, 436 F.App'x 639 (7th Cir. 2011) (unpub. op.), which stated more than "a prosecutorial hunch" or "suspicion" is required. He found:

> Here, we have more than a hunch. We have more than suspicions. Good faith basis is a low standard. We've got an email that indicates that the incident -- I should say, there's some evidence that the incident did happen, so it's enough to get over the low bar of good faith basis for the question.

He continued by reminding the parties that he was deciding only the issue of good faith basis to ask the question, and saying, "I'm not making any other ruling at this time." The CDC ensured he understood the military judge's ruling:

> If I understand the ruling, that you determined that there is a good faith basis for the trial counsel to ask, "did you know," "have you heard" questions based upon the contents of this if, whatever the evidence or character evidence that comes out, is related to -- the other criteria would still apply in the analysis --
>
> MJ: Right.
>
> CDC: This is just a determination that they have a good faith basis to ask the question?
>
> MJ: Right. That was the question that I was asked to determine. I mean, whether the door is opened, I don't know.

CDC: I understand the ruling, sir. Thank you.

The Defense then requested—and the military judge granted—"a recess to incorporate [the military judge's] ruling into what [they] are going to enter in the sentencing portion." In pre-sentencing, the Defense offered several documentary exhibits into evidence; the Defense called no witnesses. After Appellant delivered an oral unsworn statement, the Defense rested. While the court members were deliberating on sentence, the Defense provided the military judge a 20-page document (Appellate Exhibit LXIX) titled "Original Defense Exhibits." The CDC explained:

> Your Honor, I provide this in order to bring the appellate record up to speed on what the Defense is required to do in response to your ruling. The decision was driven by the matter that was discussed earlier this morning. The result of your ruling required the Defense to significantly modify the matters in which it was required to present in [Appellant's] defense. Specifically, the matters that are included in Appellate LXIX are the originals of what would have been presented and are contrasted now by what was presented in the defense exhibits here this morning.

> Additionally, the intent was to call as in-person witnesses, Sergeant [H] and Sergeant [D] and Ms. [JW]. These changes were driven by the trial counsel's [course of action] proposed that, if any type of character evidence, absent something about job performance, could open the door to this incredibly prejudicial and harmful evidence. However, no specific description of what that might be or what it would be specifically to rebut was given or required by the court. Therefore, in accordance with the ruling, it set what was essentially a broad target area for the Government to fire at and the Defense would have been required to navigate a mine field without knowing specifically what character, if any, would actually open the door. The court having ruled that the good faith basis requirement had been met, all that would have been required would be for the Government to pick at anything that could be remotely characterized as character evidence and then with no further defensible position from the Defense knowing what they were getting into. This had a chilling effect on the Defense's preparation and we responded accordingly by presenting matters that we are required to do. It was the judge's ruling on the matter that prompted this change in the defense strategy. Nothing additional.

The military judge responded:

> Understood. Obviously, I did make a finding that trial counsel
> had a good faith basis to ask the questions. However, as you
> know, I did not make a ruling as to any specifics because, obvi-
> ously, I didn't know any specifics of, you know, what would open
> the door to what or anything where that's concerned. I also didn't
> do a [Mil. R. Evid.] 403 balancing test because the issue was not
> presented to me and, obviously, I can't make a ruling on an issue
> that's not before me.
>
> I understand that you made a tactical decision based on trial
> counsel's proffer as to what he wanted to do and my ruling that
> there -- or finding rather that it was a good faith basis to ask the
> question. So noted and understood.

The difference between Appellant's actual sentencing case and his intended sentencing case is Appellant submitted character statements from the three witnesses who would have testified.

The court members sentenced Appellant to a dishonorable discharge, confinement for ten months, and reduction to the grade of E-1.

### 2. Law

#### *a. Good faith basis*

Character may be "proved by testimony about the person's reputation or by testimony in the form of an opinion." Mil. R. Evid. 405(a). "On cross-examination of the character witness, the military judge may allow an inquiry into relevant specific instances of the person's conduct." *Id.*

> There are two requirements that must be met before the Gov-
> ernment may use specific instances of conduct to impeach the
> knowledge of a defendant's character witness: (1) the [G]overn-
> ment must have made a good faith factual basis for the incidents
> raised during cross-examination of the witness; and (2) the inci-
> dents inquired about must be relevant to the character traits at
> issue in the case.

*United States v. Gee*, 39 M.J. 311, 313 n.4 (C.M.A. 1994) (quoting *United States v. Adair*, 951 F.2d 316, 319 (11th Cir. 1992) (additional citations omitted)). In *United States v. Robertson*, the United States Court of Military Appeals (CMA), the predecessor court to the United States Court of Appeals for the Armed Forces, employed a similar test relating to the character trait of untruthfulness: "In order to have proper cross-examination as to misconduct relating to untruthfulness: (1) there must be a good faith belief by the opponent that the conduct occurred; and (2) the conduct must relate to instances of

untruthfulness." *United States v. Robertson*, 39 M.J. 211, 214 (C.M.A. 1994) (comparing *Michelson v. United States*, 335 U.S. 469 (1948)).

"It has long been recognized that references to such instances must be predicated upon a good faith basis for believing that they actually occurred." *United States v. Kitching*, 23 M.J. 601, 603 (A.F.C.M.R. 1986) (first citing *Michelson,* 335 U.S. 469; then citing *United States v. Donnelly*, 13 M.J. 79 (C.M.A. 1982); and then citing STEPHEN A. SALTZBURG ET AL., MILITARY RULES OF EVIDENCE MANUAL 382 (2d ed. 1986)). "'[A] prosecutorial hunch' that the defendant engaged in dishonesty is not enough" to demonstrate a good faith basis. *Abair*, 746 F.3d at 264 (first citing *DeGeratto*, 876 F.2d 576, 583 (7th Cir. 1989); and then citing *Benabe*, 436 F. App'x at 655 ("A prosecutor's questions on cross-examination must be based on more than the prosecutor's own suspicions." (Citing *United States v. Elizondo*, 920 F.2d 1308, 1313 (7th Cir. 1990)))).

### b. Preservation of improper impeachment claim

The United States Supreme Court in *Luce v. United States*, 469 U.S. 38, 42 (1984), held "that to raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify." The *Luce* rule was extended to courts-martial. *See United States v. Miller*, 48 M.J. 49, 56 (C.A.A.F. 1998) (detailing the evolution of the application of *Luce* to courts-martial); *United States v. Sutton*, 31 M.J. 11, 18 (C.M.A. 1990). The CMA in *Gee* applied the *Luce* rule to cross-examination under Mil R. Evid. 405(a). 39 M.J. at 313.

In *Gee*, the "appellant originally sought to introduce testimony of his good military character, but ultimately chose not to call any character witnesses." *Id*. The CMA noted the "record fails to establish whether the military judge might have changed his ruling . . . during the ebb and flow of the trial;" the judge had not fully determined whether the conduct was "being inquired about in good faith;" and the judge "affirmed his willingness to entertain any objections at the appropriate time." *Id*. (footnote omitted). The CMA found "[i]t would be mere conjecture to conclude [the] appellant would have called witnesses to testify as to his good military character but for the military judge's ruling." *Id*. at 314. The CMA explained the difficulty in conducting an analysis under Mil. R. Evid. 403: "The probative value of [the] appellant's prior [misconduct] for the purpose of testing the knowledge of character witnesses cannot be weighed against its prejudicial effect absent development of the record by the defense calling the character witnesses either to testify before the members or in an Article 39(a)[, UCMJ,] session." *Id*.

### 3. Analysis

Appellant contends the military judge abused his discretion when he found the Government had a good faith basis to ask anticipated defense sentencing

witnesses about an allegation that Appellant molested his niece. He also asserts the military judge erred by not considering Mil. R. Evid. 403 before making that finding. Further, Appellant claims the "military judge's finding of a good faith basis prejudiced [Appellant] because it caused his [d]efense team to completely alter their sentencing case." We find Appellant waived this issue, and no relief is warranted.

We address Appellant's contentions in reverse order. The military judge's finding that the Government had a good faith basis to ask potential character witnesses about an allegation of child molestation influenced trial defense counsel's decisions, but did not "cause" those decisions. "Tactical decisions by defense counsel, designed to keep such 'doors' closed, are a legal fact of life and often call for foregoing the presentation of evidence or witnesses (including the accused) favorable to the defense." *Gee*, 39 M.J. at 314. As in *Gee*, here "Appellant made a tactical decision not to present his character witnesses and must accept the consequences of that decision." *Id.* One consequence is that Appellant's claim of error is not preserved.

Not only did the Defense fail to call witnesses to testify about a character trait of Appellant, and fail to present or even proffer to the military judge what character traits its proposed witnesses would address, they failed to ask the military judge to rule on the propriety of the Prosecution's proposed questions. In this case, the military judge agreed the Prosecution had a good faith basis, but left any other issues or objections for when they became ripe, including an analysis of whether the probative value of any particular question was significantly outweighed by the danger of unfair prejudice. The facts in this case are very similar to those in *Gee* in that the military judge was asked to—and did—make a finding on only one of the two requirements for the Government to impeach character witnesses under Mil. R. Evid. 405(a): good faith factual basis to raise the misconduct with character witnesses. The military judge did not—and was not asked to—determine whether the "incidents inquired about [were] relevant to the character traits at issue" or were too prejudicial. *Gee*, 39 M.J. at 313 n.4 (quoting *Adair*, 951 F.2d at 319). In this case, trial defense counsel chose to change its tactics without objecting to the questions based on Mil. R. Evid. 401 or 403, and therefore did not allow the military judge to consider the remaining prong under *Gee/Adair*.[12]

In light of the military judge's determination about good faith, the Defense had options besides introducing unsworn character statements in lieu of sworn

---

[12] We acknowledge this case differs from *Luce* and *Gee* in that trial defense counsel in this case stated that their decision not to call sentencing witnesses resulted from the military judge's finding. We find this difference to be immaterial to our resolution of the issue.

testimony. They could have introduced sworn affidavits from the would-be witnesses. They could have called the witnesses in an Article 39(a), UCMJ, session to make and to allow the military judge to rule on objections, and could have asked the military judge to reconsider his determination that the Prosecution had a good faith basis. We will not second-guess the reasonable tactical decision by the Defense to follow the course they chose. *See United States v. Avery*, 52 M.J. 496, 498 (C.A.A.F. 2000) (citing *United States v. Voorhees*, 50 M.J. 494, 500 (C.A.A.F. 1999)); *see also United States v. Washington*, 29 M.J. 536, 539 (A.F.C.M.R. 1989) ("Challenges to evidence are tactical decisions made in the heat of battle, and we will not second guess a trial advocate on his choice of tactics where there is a reasonable basis.").

As in *Gee*, "[i]n light of our opinion we need not opine as to the correctness of [the military judge's] ruling" that the Prosecution had a good faith basis to ask the question. *Gee*, 39 M.J. at 312 n2. Because the Defense chose not to pursue live witness testimony, we do not know what the witnesses would have said about Appellant's character, what questions the Prosecution would have asked in cross-examination, and whether the military judge ultimately would have allowed the Prosecution's questions. We find ourselves in an "evidentiary vacuum" similar to the CMA in *Gee*, *id.* at 314, due to Appellant's tactical decision at trial. In failing to call a character witness in sentencing, Appellant failed to preserve his objection to the military judge's finding that the Prosecution had a good faith basis to question character witnesses about Appellant's uncharged misconduct.

## D. Challenges for Cause

### 1. Law

An accused has "the right to an impartial and unbiased panel." *United States v. Nash*, 71 M.J. 83, 88 (C.A.A.F. 2012) (citation omitted). A person detailed to a court-martial shall be excused whenever it appears they "[s]hould not sit as a member in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality." R.C.M. 912(f)(1)(N). "'Substantial doubt' exists where the presence of a member on the panel would cause the public to think 'that the accused received something less than a court of fair, impartial members,' injuring the public's perception of the fairness of the military justice system." *United States v. Commisso*, 76 M.J. 315, 323 (C.A.A.F. 2017) (citation omitted). "The burden of establishing that grounds for a challenge exist is upon the party making the challenge." R.C.M. 912(f)(3).

Potential court-martial members are subject to challenges for cause under actual bias and implied bias theories. *United States v. Hennis*, 79 M.J. 370, 384 (C.A.A.F. 2020). Under the former, the question is whether the member personally holds a bias "which will not yield to the military judge's instructions

and the evidence presented at trial." *Nash*, 71 M.J. at 88 (citation omitted). Claims that a military judge erred with respect to challenges alleging actual bias are reviewed for an abuse of discretion. *Hennis*, 79 M.J. at 384.

Implied bias is measured by an objective standard. *United States v. Bagstad*, 68 M.J. 460, 462 (C.A.A.F. 2010) (citation omitted). "Implied bias exists when, 'regardless of an individual member's disclaimer of bias, most people in the same position would be prejudiced [that is, biased].'" *United States v. Briggs*, 64 M.J. 285, 286 (C.A.A.F. 2007) (alteration in original) (quoting *United States v. Napolitano*, 53 M.J. 162, 167 (C.A.A.F. 2000)). We assess implied bias based on the "totality of the factual circumstances," assuming the "hypothetical 'public'" is familiar with the military justice system. *Bagstad*, 68 M.J. at 462 (citations omitted).

We review the military judge's ruling on a claim of implied bias "pursuant to a standard that is 'less deferential than abuse of discretion, but more deferential than de novo review.'" *United States v. Dockery*, 76 M.J. 91, 96 (C.A.A.F. 2017) (quoting *United States v. Peters*, 74 M.J. 31, 33 (C.A.A.F. 2015)). This standard is appropriate "in light of the fact that resolving claims of implied bias involves questions of fact and demeanor, not just law." *United States v. Woods*, 74 M.J. 238, 243 n.1 (C.A.A.F. 2015). Appellate courts afford greater deference to a military judge's ruling on a challenge for implied bias where the military judge puts his analysis on the record and provides a "clear signal" he applied the correct law. *United States v. Rogers*, 75 M.J. 270, 273 (C.A.A.F. 2016) (citations omitted). "In cases where less deference is accorded, the analysis logically moves more towards a de novo standard of review." *Id.*

"The military judge is [ ] mandated to err on the side of granting a challenge[; t]his is what is meant by the liberal grant mandate." *Peters*, 74 M.J. at 34 (citation omitted). That is, "if after weighing the arguments for the implied bias challenge the military judge finds it a close question, the challenge should be granted." *Id.* Military judges who squarely address the liberal grant mandate on the record are given greater deference on appeal than those who do not. *United States v. Clay*, 64 M.J. 274, 277 (C.A.A.F. 2007).

"[A] prior connection to a crime similar to the one being tried before the court-martial is not per se disqualifying to a member's service." *United States v. Terry*, 64 M.J. 295, 297 (C.A.A.F. 2007) (upholding military judge's determination of no actual or implied bias where court member's wife had been sexually abused before they met, and rarely discussed it).

### 2. Defense Challenge for Cause

Appellant asserts the military judge erred when he denied Appellant's challenge for cause against Staff Sergeant (SSgt) DMC based on implied bias. We find the military judge did not err.

### a. Additional Background

Not long after the court-martial was assembled, the military judge directed each court member to review the "flyer," which contained the specifications and charges in the case against Appellant.

In group voir dire, the military judge asked, "Does anyone have any prior knowledge of the facts or events in this case?" One of the court members, SSgt DMC, answered in the affirmative, adding "I have read [the charges] because of our promotions[, w]hat was given to us." She also responded, "That is all I am aware of . . . ." Later, SSgt DMC mentioned she regularly works with some members of the legal office as part of her duties with the promotions office, but would not need to do so during the pendency of the trial. After the military judge talked about the anticipated length of the trial, SSgt DMC offered that her pregnancy due date was 5 July 2023—in about three weeks.

Still in group voir dire, the circuit defense counsel asked, "Has someone close to you been the victim of sexual assault?" SSgt DMC and six other court members answered in the affirmative. SSgt DMC answered in the negative for the CDC's remaining questions about sexual assault and domestic violence, including that she did not know anyone charged with a sexual assault or domestic violence offense, she did not believe anyone who is charged with such an offense necessarily should be convicted, and she had not volunteered for any sexual assault prevention events or to be a victim advocate.

In individual voir dire by the military judge, SSgt DMC elaborated on her answers. Regarding her pregnancy, her only current concern was sitting more than two hours without a break to stand. She acknowledged the chance she could go into labor early. She stated that at this point in her pregnancy, she was still working and still able to focus on her work, and she did not plan to take leave before the birth. Regarding a victim of sexual assault, she said her husband was assaulted as a young child by a family member 20 years ago, and she learned about it at the beginning of their marriage 5 years ago. She denied it is "something that's present in [her] life and [his] life in [their] marriage." Regarding its impact on her marriage, she said through counseling they learned "that was the reason for the communication issue that we have." She believed the issue had been resolved, and added that communication in their marriage is "a lot better than it was before." Regarding what she knew of Appellant's case, SSgt DMC remembered reading the charges against Appellant in the context of processing his non-promotion action.

The Defense challenged SSgt DMC for implied bias based on her husband's childhood assault and her pregnancy; they did not challenge her for her knowledge of the charges or the promotion action. They argued that "the impact of this, even 20 years later, affects the potential member" because

SSgt DMC said it came up in the context of her husband's communication style in their marriage. In his argument, trial defense counsel presumed SSgt DMC would not be able to sit and pay attention throughout the trial due to pregnancy-related discomfort. The Government opposed the defense challenge.

The military judge considered actual bias, implied bias, and the liberal grant mandate for defense challenges, and denied the defense challenge against SSgt DMC. He noted that SSgt DMC was "adamant" that her husband's experience did not affect her, and "communication is an issue for many couples." He considered a basis the Defense did not raise: that SSgt DMC had seen the charges and the promotion action. He found that, based on her answers, she had no "exposure" to the facts beyond the "verbiage with regard to the charge." He did not mention her pregnancy when he denied the challenge, but raised it before preemptory challenges; he found the Defense's argument on that basis not "compelling."

SSgt DMC remained on the panel after the R.C.M. 912(f)(5) random assignment. The Defense exercised its preemptory challenge on a court member whom they had not challenged for cause. SSgt DMC remained on the panel throughout Appellant's court-martial.

### b. Analysis

Appellant claims the military judge abused his discretion in not granting the defense challenge against SSgt DMC for implied bias. He repeats the two arguments he raised at trial—SSgt DMC's husband and her pregnancy—and one he did not raise at trial—SSgt DMC's work in the promotions office. He argues all three together "create a high risk that the public would perceive that the panel that convicted [Appellant] was less than the constitutionally fair and impartial panel he was entitled to." We find unconvincing Appellant's three arguments individually and together.

Appellant has not carried his burden to demonstrate grounds for challenge. SSgt DMC's husband's experience was far removed from SSgt DMC. The fact that it surfaced in the context of communication issues between them in the past should not cause the public to question her participation on Appellant's court-martial. Appellant points to presumptions about pregnant people to support his challenge against a pregnant SSgt DMC; we decline to follow suit. Finally, Appellant did not ask SSgt DMC about, or challenge SSgt DMC for knowing about, the charges and the promotion action, indicating this was not a close call. By the time of voir dire—and after each court member reviewed the flyer—SSgt DMC knew no more about the facts of the case than the other court members. Although she knew of a promotion action in Appellant's case, she gave no indication that knowledge would affect her ability to sit as a fair and impartial court member. Even applying a stricter standard of review than

abuse of discretion, we find the military judge did not err in denying the defense challenge for cause against SSgt DMC.

### 3. Government Challenge for Cause

Appellant asserts the military judge erred when he granted Government's challenge for cause against Major (Maj) NS based on actual "bias against a specific trial counsel whose removal from the prosecution team would have remedied the member's bias." We find the military judge did not err.

#### a. Additional Background

During group voir dire, the Government asked the court members, "is there anyone who, for any reason that maybe previously has not come up, anyone who thinks that you may not be able to give either [Appellant] or the United States a fair trial in this proceeding?" Maj NS responded in the affirmative. Similarly, the Defense asked the court members whether "any panel member believe[s], for whatever reason, that perhaps you should not sit as a member of this court-martial," and Maj NS responded in the affirmative.

In individual voir dire, the military judge asked Maj NS about those responses. Maj NS said, "I do think that there could be a bias for me against the Government in this case based on a previous case that I was involved with and I was a jury member for [ ]," and "I was unhappy with the method and way the U.S. Government represented the case." It became clear that this other case was not a court-martial but an administrative discharge board. Maj NS thought the Government failed to prove knowing use of a drug. He said, "The way in which the facts were presented in the case did not allow the accused a fair trial." He admitted that in Appellant's court-martial, he felt "like there could be a slight bias against [the] U.S. Government," especially given the other case was just a few weeks ago.

The trial defense counsel then questioned Maj NS. He elicited that the Government's representative at the discharge board was one of the trial counsel in Appellant's court-martial, Captain (Capt) A.

> Q. Granted, you had a -- I guess a sour experience in your last -- that last board. Can you set that aside, absent the counsel themselves, and consider this independently of that other board?
>
> A. I'm going to do my best.
>
> Q. Do you feel that that was -- if that was just a [Capt A] problem in that last board and that is removed from this particular issue, that you can give both sides a fair trial?
>
> A. Yes, sir.

When trial government counsel asked Maj NS whether he would "be able to completely set aside that other experience from a few weeks ago when [Capt A] might be advancing some argument or advocating for what should be done in this case," he replied, "I'm not sure."

The military judge followed up with Maj NS on this line of questioning:

> Q. Will you base your own decision -- your decision only on the evidence presented at trial, rather than your personal experiences? I'm going to qualify that -- that would include setting aside what happened in the discharge board. Do you think you can do that?
>
> A. I think so.
>
> Q. There's no right or wrong answer.
>
> A. That's why I made the statement, I think so.
>
> Q. All right. Do you believe that you can give this accused a full, fair and impartial hearing?
>
> A. I do.
>
> Q. I'm going to ask you one more question and, again, no right or wrong answer. Do you believe that you can give the United States a full, fair and impartial hearing?
>
> A. I think so.

The Government challenged Maj NS for cause based on actual and implied bias. They argued that "he failed to indicate that he could give the Government a fair trial," demonstrating actual bias. Additionally, they argued "the force with which he was upset about that recent hearing" demonstrated implied bias. The Defense opposed, arguing that Maj NS did not have a bias against the Government, only a bias against Capt A. The Defense asserted they "asked [Capt A] to recuse herself and she has declined to do so."

The military judge granted the government challenge for cause based on implied bias only. He explained, in part:

> I will note in noticing [Maj NS]'s demeanor and body language, even yesterday, he did not appear happy. He didn't appear like he wanted to be here. He seemed put out, honestly. That's my, the military judge's assessment. Even when asking questions in individual voir dire, he was -- appeared stoic.
>
> . . . .
>
> I'm not totally convinced, defense counsel, of your position that, if hypothetically -- if hypothetically [Capt A] were to be -- were

30

excused, let's say, by the [staff judge advocate], that [Maj NS] wouldn't hold the same bias against the Government because, again, she is an extension of the Government. I base that, again, on [Maj NS]'s demeanor, the way he answered the questions, the way he held himself throughout the voir dire process. He used words like he can do his best to set aside what happened at Mildenhall. As trial counsel point out, my duty is to apply the law equally to both sides and I believe that's what I have done here in granting the challenge for cause.

### b. Analysis

We find the military judge did not err in his determination that Maj NS appeared to be biased against the Government, and not just Capt A specifically. Therefore, we reject Appellant's argument that removal of Capt A would have cured the bias.[13]

Maj NS was clear that he held a bias against the Government based on Capt A's performance during the recent administrative discharge board. He was less clear about whether her removal from the trial team would allow him to give the United States a fair trial. Maj NS's answers, including "I think so," as well as his demeanor gave the military judge just cause to find Maj NS "[s]hould not sit as a member in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality." R.C.M. 912(f)(1)(N). Again, even applying a stricter standard of review than abuse of discretion, we find the military judge did not err in excusing Maj NS from Appellant's court-martial panel.

## E. Trial Counsel's Sentencing Argument

Appellant contends that during argument on sentence, trial counsel "sought to inflame the passions and prejudices of the panel by improperly suggesting the members would be responsible for any future sexual assaults committed by [Appellant]." We disagree, but conclude Appellant waived the issue.

### 1. Additional Background

Before argument from counsel in sentencing, the military judge provided the members instructions orally. In part, he instructed them:

---

[13] In support of his argument that trial counsel should have been removed from the prosecution team vice the member being excused for bias, Appellant cites one case, *United States v. Royster*, 42 M.J. 488, 490 (C.A.A.F. 1995), for its proposition that "prosecutors are fungible; and procedures are readily available to compensate for their unavoidable absences during a trial."

> In sentencing the accused, you must impose punishment that is sufficient, but not greater than necessary, to promote justice and to maintain good order and discipline in the armed forces. In doing so, you must take into consideration the following factors:
>
> The nature and circumstances of the offense and the history of the characteristics of the accused;
>
> The impact of the offense on the financial, social, psychological or medical well-being of any victims of the offense; and the mission, discipline or efficiency of the command of the accused and any victims of the offense;
>
> The need for the sentence to reflect the seriousness of the offense; promote respect for the law; provide just punishment for the offense; promote adequate deterrence of misconduct; protect others from further crimes by the accused; rehabilitate the accused; and provide, in appropriate cases, the opportunity for retraining and returning to duty to meet the needs of the service; and the sentences available under these rules as I have instructed you.
>
> In applying these factors, you may consider any evidence admitted during both the findings proceeding and the pre-sentencing proceeding of this court.

In argument, trial counsel recommended the members impose a sentence to include a dishonorable discharge, at least three years of confinement, and reduction to the grade of E-1. Trial counsel laid out three reasons for her recommendation. Appellant claims error during the portion where trial counsel provides her third reason: rehabilitation of Appellant. The specifically alleged errors are emphasized:

> Number three, and lastly, your sentence should also answer the question, how much confinement does [Appellant] need to be rehabilitated. The *next time that he's intimate with someone, are you going to feel confident that he's going to stop when someone says stop? Because, right now, the answer to that is no.* [Appellant] has been to dozens of trainings on sexual assault. The problem is not that he's confused, it's that he doesn't have a respect for the law. He doesn't think that rules and boundaries apply to him. [Appellant] thought that it was okay to sexually assault [CJD] because he didn't think anybody would believe her.
>
> . . . .

. . . There were months after this assault that he continued to blame [CJD] for what happened and manipulated her into believing that it was her fault she got assaulted. He made her believe that she was the one who was responsible for his conduct and his behavior.

*Members, you are charged with protecting the public from [Appellant] and making sure that what happened here, doesn't happen again. What kind of risk are you willing to accept?* A sentence of at least three years of confinement is the time that [Appellant] needs to ensure that this doesn't happen again. [Appellant] may have some rehabilitative potential. He seems apologetic, but that doesn't erase the misconduct. He is going to need a long period of confinement to reflect on his behavior and to be deterred from doing this again.

*Ask yourself, how long is it going to take for you to feel sure that this won't happen again. Don't allow [Appellant] to walk out of this courtroom and take advantage of the next unsuspecting person. This is your moment to send a message that this kind of behavior won't be tolerated.* Members, the judge instructed you the sentence must be sufficient, but not greater than necessary. Because of the need to punish [Appellant], the impact this has had on the victim and the need for [Appellant] to be rehabilitated, the only just sentence in this case is a reduction to the rank of E-1, at least three years of confinement and a dishonorable discharge.

Appellant did not object to the military judge's instructions or to trial counsel's sentencing argument. In fact, after the military judge completed his instructions to the court members, he asked counsel whether they "object to any of the instructions [he gave], arguments of counsel, or request other instructions." Trial defense counsel stated, "No, Your Honor."

**2. Law**

An appellant who fails to object forfeits his claim of error on appeal, but an appellant who affirmatively declines to object waives his claim. *See United States v. Davis*, 79 M.J. 329, 331 (C.A.A.F. 2020). Whether a claim is waived is reviewed de novo. *Id.* Generally, an affirmative waiver leaves "nothing left" to correct on appeal. *Davis*, 79 M.J. at 331 (citations omitted). However, pursuant to Article 66(d)(1), UCMJ, 10 U.S.C. § 866(d)(1), Courts of Criminal Appeals (CCA) have the unique statutory responsibility to affirm only so much of the findings and sentence that they find are correct and "should be approved." This includes the authority to address errors raised for the first time on appeal

despite waiver of those errors at trial. *See, e.g.*, *United States v. Hardy*, 77 M.J. 438, 442–43 (C.A.A.F. 2018). A CCA assesses the entire record and determines "whether to leave an accused's waiver intact, or to correct the error." *United States v. Chin*, 75 M.J. 220, 223 (C.A.A.F. 2016).

During sentencing argument, "[t]rial counsel may . . . refer to the sentencing considerations set forth in R.C.M. 1002(f)." R.C.M. 1001(h). These considerations include the need for the sentence to: "(A) reflect the seriousness of the offense; (B) promote respect for the law; (C) provide just punishment for the offense; (D) promote adequate deterrence of misconduct; (E) protect others from further crimes by the accused; [and] (F) rehabilitate the accused . . . ." R.C.M. 1002(f)(3).

### 3. Analysis

The threshold question is whether Appellant preserved, forfeited, or waived his allegations of error in the trial counsel's sentencing argument. Trial defense counsel did not object to the argument, even when the military judge asked, so the issue was neither preserved nor merely forfeited. *See United States v. Cunningham*, 83 M.J. 367, 374 (C.A.A.F. 2023) (finding an express waiver of improper sentencing argument where appellant affirmatively declined to object), *recon. denied*, __ M.J. __, No. 23-0027, 2023 CAAF LEXIS 573 (C.A.A.F. 7 Aug. 2023). Instead, Appellant waived this issue.

Finding waiver, we next consider whether to pierce Appellant's waiver relating to trial counsel's sentencing argument. In our experience, it is common for the military judge to ask counsel whether they have any objections to instructions or requests for additional instructions, but it is less common for the military judge also to ask counsel whether they have any objections to the arguments of counsel, as happened in this case. Perhaps the military judge heard arguably improper argument, and gave counsel the opportunity to request curative measures. The Defense affirmatively declined any such opportunity. Perhaps the Defense recognized that trial counsel's argument was within the bounds of R.C.M. 1002(f)(3), as it addressed considerations such as the need for the sentence to promote respect for the law, promote adequate deterrence of misconduct, protect others from further crimes by the accused, and rehabilitate the accused.

We have considered the claimed erroneous comments in the context of the entire sentencing argument, and considered the sentencing argument in the context of the entire court-martial. *See United States v. Baer*, 53 M.J. 235, 238 (C.A.A.F. 2000). Having also reviewed the entire record, and mindful of our mandate to "approve only that which 'should be approved,'" we have determined to leave intact Appellant's waiver of the alleged error. *See Chin*, 75 M.J. at 223.

### III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court